UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INGE BERGE,<br><br>                     Plaintiff,<br><br>    v.<br><br>SCHOOL COMMITTEE OF GLOUCESTER; BEN LUMMIS, in his personal capacity; ROBERTA A. EASON, in her personal capacity; and STEPHANIE DELISI, in her personal capacity,<br><br>                     Defendants. | Civil Action No. 1:22-CV-10346<br><br>**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

      This case is about a citizen's right to record public employees in an area that is open to the public and then to publish that recording without the government threatening criminal charges for doing so.  Some call Plaintiff Inge Berge ("Mr. Berge") a "gadfly."  Others call him a "pain in the ass from Gloucester, Mass."  He calls himself a "citizen journalist."  We can call him what we like, but he immigrated to the United States to enjoy its civil liberties.  When he sees these liberties threatened, he publishes to a wide audience, criticizing these threats.  Mr. Berge serves as a watchdog over those dwindling, and now unfashionable (at least in Massachusetts), liberties.

      Mr. Berge entered a public building to question government officials about an irrational policy.  He brought along a video camera, which he displayed openly, and announced its use.  He questioned multiple officials in a public-facing government office.  One did not object, another calmly objected, and another flipped-out over it.  Whatever the reaction, Mr. Berge had every right to film these individuals as they served in their official capacities in a place where he had every right to be.  He then published the video on his publicly accessible Facebook page, along with his commentary.  Mr. Berge then received a letter from the government threatening prosecution unless he ceased publication of his video footage and he was forced to retain counsel.

**1.0     Statement of Relevant Facts in the First Amended Complaint ("FAC")**

On March 3, 2022, Mr. Berge entered the Office of the Superintendent of Gloucester Public Schools ("Administrative Building") to discuss a government policy regarding seating at school events purportedly for the purpose of public safety, despite all statewide COVID-19 mandates having been lifted. (FAC at ¶ 8.) The irrational policy limited ticket sales in a 300-seat auditorium to only 175 attendees, which in itself could make some sense. However, then the seating confined those attendees to a dense area in the auditorium's center, rather than spreading them apart. The end result was fewer tickets available, but a crowd density that was likely greater than if it had been open seating throughout the auditorium - a policy that reduced access, but increased risk.

The Administrative Building is fully accessible to the public. (*Id.* at ¶ 9.) It does have private offices therein, but the public-facing reception is neither a restricted area nor private area. (*Id.* at ¶ 13.) Upon entering the building, and at all times, Mr. Berge held his camera out in the open, making it obvious to all that he was filming. (*Id.* at ¶ 11.) When Mr. Berge entered the building, he was directed to Defendant Executive Secretary Stephanie Delisi ("Delisi") and began a conversation with her by stating "I'm filming this, I'm doing a story on it." (*Id.* at ¶ 12.) Gregg Bach, the Assistant Superintendent of Teaching & Learning, then approached Mr. Berge and spoke with him regarding Mr. Berge's attempt to attend his daughter's play and the ticket policy. (*Id.* at ¶ 14.) The two had a pleasant conversation, where Mr. Berge was clearly filming, and Bach had no objection. (*Id.*) After his interview was complete, Mr. Berge left the building. (*Id.*)

At the time that Mr. Berge entered the building, there was neither signage nor any other indication that video recording or photography was restricted, not permitted, nor even discouraged. (*Id.* at ¶ 10.) While in the building, at no point did anyone inform Mr. Berge that filming was not permitted in the Administrative Building. (*Id.* at ¶ 13.) Two officials did state that they *personally*

did not want to be filmed and retreated to private offices. (*Id.*) However, what an official personally wants is not law or policy just because they want it. There is no formal policy prohibiting recording.[1] Further, when Ms. Delisi responded by screaming, it was a fair presumption that she was not quoting any official policy or law, but rather having a personal episode.

Mr. Berge uploaded the Video[2] on his publicly accessible Facebook page with his commentary. (*Id.* at ¶ 15.) Mr. Berge later received a letter (the "Demand Letter") sent on behalf of Defendants. The Demand Letter, delivered by certified mail, falsely alleged that Mr. Berge was in violation of Mass. Ann. Laws ch. 272, § 99(c) (the "Wiretapping Law") and coercively demanded that the government or its employees would pursue legal action if Berge did not immediately remove the Video from his Facebook account. (FAC Exhibit 1.) Mr. Berge presumed that since the Wiretapping Law is a criminal statute, the threat was to prosecute him, criminally.

## 2.0 Legal Standard

FRCP 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Under Fed. R. Civ. P. 12(b)(6), a complaint only needs to allege facts sufficient to "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 555. A court must "accept[] as true all well-pleaded facts, analyz[e] those facts in the light most hospitable to the plaintiff's theory, and draw[] all reasonable inferences for the plaintiff." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). In bringing a motion to dismiss for failure to state a claim, a defendant may not rely on evidence or information outside the four corners of the complaint without

---

[1] If such a policy existed, it would not survive constitutional scrutiny.
[2] Available at: <https://www.facebook.com/inge.berge.9/videos/1571702173204109>.

converting the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d); *see Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 615 (D. Mass. 2016) (finding that "the Court is limited at this stage to evaluating the four corners of the complaint and certain undisputed or critical documents, not statements made at oral argument").

**3.0  Argument**

Defendants conflate two rights enjoyed by Mr. Berge under the First Amendment. He had the right to record. He had the right to publish. The Demand Letter threatened and infringed upon both of these rights. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes ... *the manner in which government is operated* or should *be operated*...." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966) (emphasis added). This suit is brought to vindicate both the right to record how Defendants operate the government and the right to publish about such operations, including the right to publish documentary evidence about how certain government officials behaved when questioned.

First Amendment claims are analyzed in three steps. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). The plaintiff must first demonstrate that the activity at issue is protected by the First Amendment. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Second, if the activity at issue is protected, the context of the activity is analyzed in order to determine which First Amendment standard or standards apply. *Cornelius*, 473 U.S. at 797. And third, the Government's justification for restricting the activity is examined to ensure that it meets the applicable standard. *Id.* Under this analysis, the recording and publication were fully protected.

### 3.1 Plaintiff's Recording Was Protected Under the First Amendment

The protections of the First Amendment extend not just to the traditional press embodied by newspapers, television, books, and magazines, "but also humble leaflets and circulars," which were meant to play an important role in the discussion of public affairs. *Mills v. State of Ala.*, 348 U.S. 24, 219 (1966). The First Circuit has extended this principle to video recording by recognizing that the First Amendment protects "a citizen's right to film government officials ... in the discharge of their duties in a public space...." *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011). "The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper." *Id.* at 84. "Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status." *Id.* The Supreme Court does not "accord greater First Amendment protection to the institutional media than to other speakers." *Obsidian Fin. Grp., LLC, v. Cox,* 70 F.3d 1284, 1290 (9th Cir. 2014) (collecting cases). If it did, one could imagine a chilling effect that would change history: citizen Darnella Frazier had as much right to film Derek Chauvin killing George Floyd as CNN would have. The government in this case would disagree, requiring the suppression of Frazier's video, if only Derek Chauvin had screamed at her that he didn't want to be filmed.

### 3.1.1 Mr. Berge has the Right to Record

The First Amendment protects the right of the public to record government officials in the discharge of their duties in a public space. *Glik*, 655 F.3d at 84. "[I]nformation gathering about matters of public interest through audio and audio-visual recording in public spaces is protected by

the First Amendment ... subject to reasonable restriction." *Project Veritas Action Fund v. Conley*, 244 F. Supp. 3d 256, 262 (D. Mass. 2017) (citing *Glik*, 655 F.3d at 83-84). "*Glik* explained in this regard that protecting the right to collect information about government officials 'not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally.'" *Project Veritas Action Fund v. Rollins,* 982 F.3d 813, 832 (1st Cir. 2020) (citations omitted). "[A]udio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). Mr. Berge has a First Amendment right to record and gather information about how his government functions.

Defendants appear to concede as much. Defendants state "the right to record affords protection for recordings on matters of public interest, not purely personal matters." (Motion at 10.)[3] The Defendants even cite case law in support of Mr. Berge's constitutionally protected right to record. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 95 (D. Mass. 2002) ("plaintiffs had a constitutionally protected right to record matters of public interest."). Defendants provide no support for their conclusory statement that the right to record ends when the video is a "purely personal matter." Nevertheless, this lack of support for this bogus argument should not affect the outcome – since Berge's recording was on a matter of public concern.

---

[3] Defendants are dead wrong when they claim that the First Amendment does not protect recording of "purely personal matters." (Motion at 10.) This is why they do not cite a single case supporting this wished-for theory. Mr. Berge heard about the COVID seating policy through a personal experience – but if a journalist writing about their own experiences loses First Amendment protection, then the institutional press would lose its protections as well. There is no legal basis to cleave the First Amendment in half.

### 3.1.2 Mr. Berge's Recording was Legally Proper

The Defendants admit that Mr. Berge was allowed to record, but they appear to argue that he came at the wrong time. Specifically, the Defendants argue that "[b]arring the recording of school business activities conducted in the Administration Office (whether open or secret) is a content-neutral restriction of general applicability." (Motion at 8.) What restriction? There was neither signage nor any other indication that video recording or photography was restricted. (FAC ¶ 10.). At no point while Mr. Berge was recording in the Administrative Building did anyone tell him there was a restriction. (*Id.* at ¶ 13.) Further, the Demand Letter made no mention of any formal restriction. (FAC <u>Exhibit 1</u>). The Defendants cite to no restriction in their motion. The government doesn't get to just invent a policy out of thin air. *Child Evangelism v. Montgomery Schools*, 457 F.3d 376, 386 (4th Cir. 2006) ("Thus, there is broad agreement that, even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment.") (collecting cases). If any such policy exists now, it did not exist at the time of filming. The government does not get to parrot "content-neutral restriction" without such a restriction ever existing until Delisi flipped out at Mr. Berge. A government restriction is not created by a government employee simply shouting at a citizen.

Moreover, even if there were a policy barring the recording of business activities, it would be unconstitutional. If it were an "outright ban", it would be unconstitutionally overbroad like the Wiretapping Law in *Project Veritas Action Fund*, 982 F.3d at 837. The term "school business activities" is void for vagueness. Defendants claim recording in the office is disruptive because their work involves confidential information. (Motion at 8-9.) But, Mr. Berge did not film student records nor did he interact with confidential information. He filmed his public conversations with government officials where they spoke about the seating policy, the application thereof, and

exceptions or amendments thereto.  (FAC at ¶¶ 8 & 14.)  The government is trying to create a smokescreen about privacy when this is not what was at stake.  What was at stake was government officials' pride – hurt by Mr. Berge, they decided to abuse their authority to threaten him.

Based on the Superintendent's own words, questioning Gloucester Public School officials and recording their answers is permitted in the Administrative Building *at least some of the time*.  *See* (Motion at 4.) ("The Superintendent continued: 'I'm happy to speak with you about O'Maley if you turn that off.  *You do not have my permission to film here **right now***.") (emphasis added).  The Superintendent's statement indicates unbridled discretion, untethered from any policy, usually aimed at suppressing a particular viewpoint and unconstitutional under any standard of scrutiny.  *Child Evangelism*, 457 F.3d at 386 ("[T]he dangers posed by unbridled discretion — particularly the ability to hide unconstitutional viewpoint discrimination[.]").  In *Iacobucci v. Boulter*, government officials repeatedly told a journalist to turn off his camera and stop filming.  193 F.3d 14, 17-18 (1st Cir. 1999).  Because the filmer's "activities were peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights," a police officer "lacked the authority" to arrest him for filming in a location where he was lawfully permitted to be.  *Id.* at 25. When Mr. Berge has the right to be on public property, in the absence of a constitutional enumerated policy, he has a right to record.  That does not end because someone shouts at him.

Rights do not require permission.  Under the Defendants' purported amorphous policy, no woman could ever record herself asking a Senator their views on abortion in the U.S. Capitol if the Senator arbitrarily says 'you do not have my permission to film here right now.'  The U.S. Constitution provides all the permission that Mr. Berge needed.[4]

---

[4] In the off chance there is a "policy" in existence Defendants must show that it can survive constitutional scrutiny.  But as Defendants are making up the policy as they go, there is no way to evaluate the moving-target policy.

### 3.2 Plaintiff's Publication of the Video Was First Amendment Protected

The government does not get to threaten criminal prosecution for publishing truthful information. Even stolen top secret documents are lawful to publish. *See New York Times Co. v. United States*, 403 U.S. 713 (1971). The right to publish is the bedrock for freedom of speech and of the press. *See McMillan v. Carlson*, 369 F. Supp. 1182, 1185 (D. Mass. 1973) ("The right to publish is firmly embedded in the First Amendment and is central to the constitutional guarantee of free speech and a free press.") (collecting cases); *Branzburg v. Hayes*, 408 U.S. 665, 727 (1972) ("the right to publish is central to the First Amendment and basic to the existence of constitutional democracy."). If one can publish The Pentagon Papers, the "School Committee Interview Video" can also see the light of day.

#### 3.2.1 A Restriction on Publication Does Not Survive Strict Scrutiny

When First Amendment protections exist, "claimed justifications for denying or burdening free speech are to be subjected to careful and rigid scrutiny." *McMillan*, 369 F. Supp. at 1186. Defendants have the burden to establish whether their infringement "furthers an important or substantial governmental interest; [that] the governmental interest is unrelated to the suppression of free expression; and [that] the governmental interest is unrelated to the suppression of free expression; and [that] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The Defendant have not, and cannot, meet their burden on strict scrutiny.

#### 3.2.2 *Bartnicki* Does Not Support Defendants

Defendants argue incorrectly that *Bartnicki v. Vopper*, 532 U.S. 534 (2001) supports a prohibition of publication. (Motion 11.) For *Bartnicki* to apply, the Video must have been illegally

obtained. Even if Mr. Berge's video were made contrary to a "policy" that would not render it "illegally obtained." The Defendants reliance on *Barnicki* is not persuasive, but it is shameful.

Defendants are estopped from making an argument premised on Mr. Berge committing illegal conduct, where they simultaneously assert in their mootness argument that the Defendants are no longer accusing Mr. Berge of illegal conduct regarding the Video. *See Fleetboston Financial Corp. v. Alt*, 668 F. Supp. 2d 277, 280 (D. Mass. 2009) ("The First Circuit holds that judicial estoppel applies when a party is "playing fast and loose with the courts. Judicial estoppel protects the integrity of the judicial process by assuring that litigants cannot manipulate judicial procedure to convenience themselves.'") (citations and internal quotation marks omitted).

Defendants drop a blatantly false footnote stating that "courts have not yet clearly defined the scope of what constitutes an 'illegal' interception of information. Here, the plaintiff requested and was denied permission to record his visit." (Motion at 11 n. 27.) The legislature has clearly defined the scope of what constitutes illegal interception of information—the Wiretapping Law. Mr. Berge committed no illegal interception.

### 3.2.2.1 The Wiretapping Law is a Red-Herring

For Defendants to even purport to be able to restrict publication, the Video must have been the product of an *illegal* interception by Mr. Berge. There was no illegal interception. The Video was made in full compliance with the Wiretapping Law. The Wiretapping Law prohibits "Interception" – meaning "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272 § (B)(4) (emphasis added). There was nothing secret about what Mr. Berge did. The SJC has construed § 99 to only encompass recording not conducted in "plain sight" of the person

recorded, so long as that person has *no actual knowledge* it is occurring. *Commonwealth v. Hyde*, 434 Mass. 594, 605 (Mass. 2001). At all times, Mr. Berge held his camera out in the open, and it was obvious to everyone that he was filming. (FAC at ¶ 11.) Mr. Berge verbally communicated to persons in the building that he was filming. (*Id.*) The Video could never be an "illegal interception."

### 3.2.2.2 The Video was Lawfully Acquired

Mr. Berge lawfully obtained the Video. Accusations of FERPA violations are misplaced. FERPA prohibits the disclosure of "education records" by a federally-funded "educational agency or institution" without consent. 28 U.S.C. § 1232g(b). Mr. Berge is not an "educational agency or institution." FERPA is inapplicable. Moreover, the Video is not an "education record" as it contains no information directly related to a student, and it is not maintained by an educational agency or institution or by a person acting for such agency or institution. *See* 28 U.S.C. § 1232g(a)(4).

### 3.2.2.3 The Video was on a Matter of Public Concern

Gathering information about what public officials do on public property is a matter of public concern. *See Larsen v. Fort Wayne Police Dep't*, 825 F. Supp. 2d 965, 979 (N.D. Ind. 2010) ("The First Amendment is not implicated because a person uses a camera, but rather, when that camera is used … to gather information about what public officials do."). In *Glik*, the First Circuit clearly established the public's First Amendment right to record public officials doing their jobs. *Glik* is not limited to the specific circumstances there, as the First Circuit makes clear that the right is much broader, and merely "particularly true" in the circumstances of that case. *Id.* at 82. The court discussed at length the importance of citizen information-gathering to prevent misconduct of government officials. *Id.* at 82-83. The court commented that the "terse" manner in which citizen recording of public officials had been discussed in previous opinions "implicitly speaks to the

fundamental and virtually self-evident nature of the First Amendment's protections in this area." *Id.* at 84-895. *See also Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 198 (D. Me 2014) (noting that *Glik* is not restricted to police officers and the right to film is not reserved for the press).

If government policies are not a matter of public concern, then nothing is. *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("The Court has recognized the right of employees to speak on matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment.") (citations omitted). Mr. Berge published a video to comment on the unreasonableness of a government policy and how government employees acted. (FAC at ¶ 11). Mr. Berge went to a public building to discuss the seating policy. (*Id.* at ¶ 8.) It was a government policy that Defendants enforced. The newsworthy nature of COVID-19 policies is axiomatic as is the employees' gradations of responses to being questioned.

The Defendants disingenuously focus on Mr. Berge's desire for tickets to his daughter's play. But the only reason he could not obtain them was Defendants unreasonable policy. (Motion at 12.) His personal interest in what is otherwise a matter of public concern does not deprive it of its importance. In *Cirelli v. Town of Johnston School Dist.*, a teacher videotaped conditions at the school, originally to obtain evidence for grievances and complaints to state labor officials about the conditions. 897 F. Supp. 663, 665 (D.R.I. 1995). The court noted that Cirelli's "personal interest in an issue that potentially affects all of the members of the staff and student body does not strip such issue of its public nature." *Id.* at 666. Likewise, Mr. Berge's personal interest in getting tickets does not make the policy any less a matter of public concern.

### 3.3 Defendants Retaliated Against Plaintiff for Engaging in Protected Activity

To establish a prima facie case of First Amendment retaliation, a plaintiff must show: (1) that "he or she engaged in constitutionally protected conduct"; (2) that "he or she was subjected to an adverse action by the defendant"; and (3) that "the protected conduct was a substantial or motivating factor in the adverse action." *David B. v. Esposito (In re D.B. ex rel. Elizabeth B.)*, 675 F.3d 26, 43 (1st Cir. 2012). An adverse action is one that "viewed objectively ... would have a chilling effect on [the plaintiff's] exercise of First Amendment rights," *Barton v. Clancy*, 632 F.3d 9, 29 & n.19 (1st Cir. 2011), or that "would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B.*, 675 F.3d at 43 n.11. Regarding the third element, "'temporal proximity ... may serve as circumstantial evidence of retaliation.'" *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002)). "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting that government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech"). The First Amendment retaliation doctrine addresses "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996).

#### 3.3.1 All Defendants are Liable for Retaliation

Mr. Berge engaged in protected constitutional activities. The Defendants claim no adverse action because the letter threatening legal action under the Wiretapping Law was *de minimis* and

that Mr. Berge refused to be coerced into removing the Video from Facebook.[5] Government speech is "adverse action" if it is "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action [would] imminently follow." *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 689 (4th Cir. 2000), *cited in Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013). "An ... act is not *de minimis* if it would chill or silence a person of ordinary firmness from future First Amendment activities." *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 81 (D. Me. 2013) (citations and quotation marks omitted); *see also Brown v. Crowley ("Brown")*, 312 F.3d 782, 789 (6th Cir. 2002) (majority decision), *cert. denied*, 540 U.S. 823 (2003).

Mr. Berge received a certified Demand Letter from government officials alleging that he committed a felony, and that they would pursue legal action if he did not immediately remove the Video. (FAC Exhibit 1.) He was forced to hire a lawyer in response. A violation of the Wiretapping Law is a felony subject to five years in prison and a $10,000 fine for secretly recording a conversation and subject to 2 years in jail and a $5,000 fine for using such a record. G.L. c. 272, §§99(C)(1) & (3)(b). An aggrieved person may also bring a civil action against a violator. *Id.* at § 99(Q). This threat was more than *de minimis*. By any objective measure, the Demand Letter would chill a person of ordinary firmness from exercising their future First Amendment rights. The Letter was sent in retaliation to Mr. Berge's exercise of his First Amendment rights. These government officials used their position of power to chill Mr. Berge's speech.

---

[5] The Defendants also assert that they withdrew the letter after Mr. Berge filed the complaint, and then confirmed that the Defendants would not take legal action. (Motion at 14.) Those assertions are beyond the four corners of the first amended complaint. Moreover, it is uncertain if this was on behalf of all Defendants and if it would be enforceable.

### 3.4 The Individual Defendants Are Not Entitled to Qualified Immunity

Public officials are given qualified immunity from personal liability for violating the Constitution for actions taken in the exercise of discretionary functions.[6] *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *Barton v. Clancy*, 632 F.3d 9, 21 (1st Cir. 2011). Courts apply a two-prong analysis in determining qualified immunity. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). These prongs are "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id*. Defendants are not entitled to qualified immunity. Defendants violated clearly established rights.

### 3.4.1 The Right to Record was Clearly Established

As discussed above, under *Glik* and its progeny, the right to record government officials, including questioning them about their policies, is clearly established. *See Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Gericke v. Begin*, 753 F.3d 1, 9 (1st Cir. 2014) ("a citizen's right to film government officials…in the discharge of their duties in a public space' was clearly established") (quotation marks omitted); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020). The First Circuit expounded that "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and

---

[6] To the extent applicable, Plaintiff challenges the intertwined doctrines of *Monell* and qualified immunity to the extent they would combine to make no person or entity liable for a violation of constitutional rights under Section 1983, doctrines which undermine the intent and language of the statute. *See, e.g., Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) ("[T]his judge joins with those who have endorsed a complete re-examination of the doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."); *Manzanares v. Roosevelt Cty. Adult Det. Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) ("Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification.") (citation and quotation marks omitted); *Zadeh v. Robinson*, 928 F.3d 457, 480-81 (5th Cir. 2019) (Willet, J., concurring-in-part and dissenting-in-part) ("Indeed, it's curious how this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations."). Plaintiff recognizes that this Court must follow these doctrines until the Supreme Court reconsiders its approach, which Plaintiff would challenge in this case.

promoting the free discussion of governmental affairs." *Glik*, 655 F.3d at 82 (quoting *Mills*, 384 U.S. at 218) (quotation marks omitted). The right to record what officials do on public property is fundamental in an age where smartphones have replaced news vans. Defendants point to no legal authority that would contravene the right to record, let alone show it was not clearly established.

### 3.4.2 The Right to Publish was Even More Clearly Established

The right to publish without government interference under the First Amendment is clearly established, long-cherished, and jealously guarded. *See McMillan*, 369 F. Supp. at 1185 ("The right to publish is firmly embedded in the First Amendment and is central to the constitutional guarantee of free speech and a free press.") (collecting cases); *see also Red Linon Broadcasting Co., Inc. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas.... It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences...."); *Branzburg v. Hayes*, 408 U.S. 665, 727 (1972) ("the right to publish is central to the First Amendment and basic to the existence of constitutional democracy."); *Kleindienst v. Mandel*, 408 U.S. 753, 771 (1972) ("The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know."). The *Bartnicki* test offered by Defendants is a red herring. As discussed above, the Video was not obtained illegally and *Bartnicki* is inapplicable. Defendants have no excuse for violating Plaintiff's clearly-established right to publish.

### 3.5 The Gloucester School Committee is Liable

A suit against a public official in his official capacity is a suit against the government entity.[7] *Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 58 n. 1 (1st Cir.2003). The reason for this is that "it is when [the] execution of a government's policy or custom, whether made by its lawmakers

---

[7] Although the individual defendants were named in their personal capacities, to the extent necessary, Plaintiff would seek leave to amend to name them in their official capacities as well. This failure was an error, not a willful omission.

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."). A municipal government is liable when it has caused the deprivation of a constitutional right through an official policy or custom. *See Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 181 (1st Cir. 2011).

Defendant School Committee of Gloucester exercises the control and management of public schools of the City of Gloucester. G.L. c. 43, sec. 33 and Article 4, Section 4-1(a) of the Code of Ordinances, City of Gloucester. The Committee's responsibilities include creating reasonable rules and regulations. The Demand Letter was sent on "Gloucester Public Schools" letterhead. (ECF No. 4-1). The purported withdrawal was on behalf of "the District", *i.e.,* the School Committee. (ECF No. 15-2). Because the Demand letter was written, prepared, and sent out on the same day that the Video was created and published, it is plausible that the School Committee failed to properly train its employees on the First Amendment or it has established customs or policies for sending out Demand Letters in the unconstitutional manner that occurred here. As such, the School Committee is directly implicated under the theory of municipal liability for the deprivation and retaliation of Mr. Berge's First Amendment rights to record and to publish.

The School Committee is otherwise liable for the actions of the Superintendent. "One way of establishing a policy or custom is by showing that 'a person with final policy making authority' caused the supposed constitutional injury." *Rodríguez*, 659 F.3d at 181 (quoting *Welch v. Ciampa*, 542 F.3d 927, 941–42 (1st Cir.2008)). Municipal liability may be imposed for a single decision by

a final policy maker. *Rodríguez–García v. Miranda–Marín*, 610 F.3d 756, 770 (1st Cir.2010). Defendant Superintendent Lummis is a final policy decision-maker. Superintendent Lummis, with Defendants Delisi and Eason knew or should have known of the Demand Letter and approved of it being sent. (FAC ¶ 23-25.) Lummis caused constitutional injury - the School Committee is liable.

### 3.6 Plaintiff's Demands for Declaratory Relief Are Not Moot

Defendants claim that the withdrawal of the Demand Letter renders the claim moot.[8] When a defendant asserts that an event has mooted a case, "it bears the heavy burden of persuading the court that there is no longer a live controversy." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC) Inc.*, 528 U.S. 167, 189 (2000); *Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013); *Conservation Law Found. v. Evans*, 360 F.3d 21, 24 (1st Cir. 2004) (finding that the party invoking the doctrine of mootness has the burden of establishing mootness). Defendants have not met their burden.

Defendants continue, even in their very motion to dismiss, to accuse Mr. Berge of illegal activity in the creation and publication of the Video. Further, the letter was only withdrawn on the part of one defendant – something that Berge's counsel pointed out on March 22, 2022. *See* **Exhibit 1** and **Exhibit 2**. Defendants subsequently accused Plaintiff of violating FERPA.

In retaliation for the filing of the initial complaint, the Defendants published false public statements that Mr. Berge's publication of the Video was illegal. (FAC ¶ 28.). And, Mr. Berge has no intention of ceasing in his activities. Thus, to the extent there is a "new policy", Mr. Berge should have leave to amend to add a challenge to this new policy itself.

---

[8] To the extent applicable, this converts the motion into one for summary judgment, and Defendants have not complied with the local rules for summary judgment. If the Court would convert the motion, Plaintiff would then move per Fed. R. Civ. P. 56(d) to conduct discovery on the issue as to the scope and authority of the withdrawal.

Further, the "voluntary cessation" doctrine serves as an exception to mootness. *Friends of the Earth*, *Inc*. v. *Laidlaw Environmental Services (TOC) Inc*., 528 U.S. 167, 189 (2000). ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice") (citations omitted). When a defendant voluntarily ceases committing the offending activity, courts impose additional requirements to ensure that the defendant is not "temporarily alter[ing] questionable behavior" in order to evade judicial review. *Catholic Bishops*, 705 F.3d at 54 (citation omitted). Voluntary cessation does not render a case moot unless the defendant meets the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 55 (citations omitted).

Defendants do not meet this burden; they merely shrug: this "is not the stuff of judicial avoidance." (Motion at 19.) Only quite some time after Mr. Berge filed a complaint with this court did Defendants purportedly withdrawal the Demand Letter. Defendants went out of their way to harass Mr. Berge by sending the Demand Letter and attempting to chill his speech. Even in their motion to dismiss, Defendants continue to accuse Mr. Berge of illegal conduct in the making the Video and publishing it. Defendants' conduct simply seeks to evade judicial review.

Moreover, Plaintiff suffered an injury, nominal damages remain available, and the action is entitled to proceed. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978); *Diesel v. Town of Lewisboro*, 232 F.3d 92, 108 (2d Cir. 2000) ("Plaintiffs may recover nominal damages under § 1983 'in the absence of proof of actual injury.'") (quoting *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998)); *Irish Lesbian Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998); *see also Floyd v. Laws*, 929 F.2d 1390, 1402 (9th Cir. 1991); *Santiago v. Garcia*, 821 F.2d 822, 829 (1st Cir. 1987).

**4.0     Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Defendants' Motion to Dismiss in its entirety.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1(d), Plaintiff hereby requests hearing on Defendants' motion. Plaintiff believes oral argument may assist the Court in addressing the multiple issues and assertions outside the four-corners of the Amended Complaint and Plaintiff wishes to be heard.

Dated: May 11, 2022.                Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
Robert J. Morris II (*pro hac vice* pending)
mjr@randazza.com, ecf@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

*Attorneys for Plaintiff*
*Inge Berge*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2022, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza